IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BIG HART MINISTRIES ASSOCIATION INC. a/k/a BIG HEART MINISTRIES, et al., | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3-07-CV-00216 |
| | § | |
| CITY OF DALLAS, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS BIG HART MINISTRIES ASSOCIATION INC. ET AL.'S REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE ORDINANCE IS IMPERMISSIBLY VAGUE**

# TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENT ........................................................................ 1

II.    ARBITRARY ENFORCEMENT ................................................................... 1

III.   APPLICATION OF THE HOMELESS FEEDER SECTION TO INDIVIDUALS ......... 3

IV.    LIKE THE ORDINANCE, THE CITY'S RESPONSE FAILS TO CLARIFY THE
       MEANING OF "PREPACKAGED" .................................................................. 5

V.     THE CITY'S INABILITY TO DEFINE THE ELEMENTS OF THE PRIVATE EVENT
       DEFENSE CONFIRMS NO REASONABLY INTELLIGENT PERSON COULD
       UNDERSTAND THE ACTIVITIES TO WHICH THE DEFENSE APPLIES ................. 7

       A.     The contrived "private property" limitation renders the Private Event
              defense vague. ...................................................................................... 7

       B.     The remaining Private Event defense elements are ambiguous. ............................. 7

              1.     Public Advertising .................................................................. 8

              2.     Invited Guests ........................................................................ 9

VI.    THE MEANING AND APPLICATION OF THE ORDINANCE AS A WHOLE
       REMAINS UNCLEAR ................................................................................ 10

       A.     Even the City's employees do not know what the Ordinance means. .................. 10

       B.     The City also has not and cannot explain why Plaintiffs must comply with
              the Ordinance. ...................................................................................... 11

       C.     The meaning of "operation" remains unclear. ...................................................... 13

VII.   CONCLUSION ............................................................................................. 16

DM_US:23525609_5

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Bankshot Billiards, Inc. v. City of Ocala,*
    692 F. Supp. 2d 1343 (M.D. Fla. 2010) .................................................................. 12

*Camp Legal Def. Fund, Inc. v. City of Atlanta,*
    451 F.3d 1257 (11th Cir. 2006) ............................................................................ 12

*Chicago v. Morales,*
    527 U.S. 41 (1999) ................................................................................................ 11

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) ................................................................................................ 4

*Gray v. Kohl,*
    568 F. Supp. 2d 1378 (S.D. Fla. 2008) ................................................................... 4

*McGray v. City of Citrus Heights,*
    2000 U.S. Dist. Lexis 13593 (E.D. Cal. Aug. 7, 2000) ........................................... 4

*Moreland Properties, LLC v. City of Thornton,*
    559 F. Supp. 2d 1133 (D. Col. 2008) ...................................................................... 2

*Paz v. Weir,*
    137 F. Supp. 2d 782 (S.D. Tex. 2001) ..................................................................... 2

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986) ................................................................................................. 2

*Timmons v. City of Montgomery,*
     658 F. Supp. 1086 (M.D. Ala. 1987) ...................................................................... 4

## <u>Other Authorities</u>

25 Tex. Admin. Code § 229.162(40) ............................................................................ 5

25 Tex. Admin. Code § 229.162(63) ............................................................................ 6

Dallas City Code § 17-1.3 ............................................................................................. 2

Dallas City Code § 17-1.5(a) ....................................................................................... 5

Dallas City Code § 17-1.5(a)(6) ................................................................................... 5

Dallas City Code § 17-1.5(b)(6)(A) ............................................................... 13, 14, 15

ii

Dallas City Code § 17-1.5(b)(6)(A)(ii) ........................................................................... 15

Dallas City Code § 17-1.5(b)(6)(C) ................................................................................. 6

Dallas City Code § 17-1.6(a)(3) .................................................................................... 7, 9

Dallas City Code § 17-1.6(a)(b)(A) ................................................................................. 2

Dallas City Code § 17-1.6(a)(b)(C) ................................................................................. 2

Dallas City Code § 17-1.6(a)(b)(D) ................................................................................. 2

Dallas City Code § 17-1.6(a)(b)(E) ................................................................................. 2

DM_US:23525609_5

The City of Dallas' ("the City") Response (DE 86) does not address the majority of questions raised in Plaintiffs' Motion for Partial Summary Judgment (DE 80-1), ignores critical admissions, and does not refute Plaintiffs' legal arguments. As such, there is no genuine issue of material fact that the Ordinance is impermissibly vague and Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MSJ") should be granted.

## I.   SUMMARY OF ARGUMENT

Notwithstanding the irresolvable ambiguities plaguing certain terms in the Ordinance, the City's Response reveals at least three bases, which in and of themselves, justify granting Plaintiffs' motion for summary judgment that the Ordinance is vague. First, the Response does not dispute that the City has inconsistently and discriminatorily enforced the Ordinance. As a matter of law then, the Ordinance is unconstitutionally vague. Second, the Response offers no explanation for the City's enforcement of the Homeless Feeder Section against individuals even though the Section only applies to organizations. This failure to provide the requisite notice renders the Ordinance impermissibly vague. And third, the basis for the City's insistence that the food establishment Ordinance applies to non-food establishments (namely Plaintiffs) remains a mystery the City cannot solve. This unsolved mystery confirms that the Ordinance compels the City and reasonable minds to speculate about the Ordinance's meaning and applicability. Standing alone, any one of these three reasons warrant granting summary judgment that the Ordinance is unconstitutionally vague; combined, these three reasons are fatal to the Ordinance.

## II.   ARBITRARY ENFORCEMENT

Summary judgment is proper because there is no dispute that the City arbitrarily enforced the Ordinance. Unable to rebut this fact, the Response continues to rely on its misinterpretation

1

of the policy at issue in this case.  As stated in Plaintiffs' MSJ (DE 80-1 at 14[1]) and Brief in

Opposition to the City's Motion for Summary Judgment ("Opposition Brief") (DE 89 at 11-12),

the Ordinance, not its enactment, is the official policy which subjects the City to liability under

42 U.S.C. § 1983.  Moreover, as the Opposition Brief explains (DE 89 at 11-12), the City is

liable under § 1983 for its employees' actions in executing and enforcing the Ordinance, which

they have done arbitrarily and discriminatorily pursuant to the Ordinance's express authorization.

*See* Dallas City Code § 17-1.3 (authorizing the director to enforce the Ordinance); *Id*. at § 17-

1.6(a)(b)(A), (C), (D) & (E) (describing the director's unbridled discretion), App. at  4 and 8,

respectively.  Because the City's liability directly ties to the Ordinance, Plaintiffs need not

establish any other policy, custom, or practice.  *See Pembaur v. City of Cincinnati,* 475 U.S. 469,

480-482 & n.10 (1986)  (holding that a single decision by municipal policymakers can confer

liability and distinguishing such decisions from customs that confer liability); *Moreland

Properties, LLC v. City of Thornton,* 559 F. Supp. 2d 1133, 1153-55 (D. Col. 2008)  (rejecting

the contention that the plaintiff needed to prove a custom or repeated actions where liability

rested on an ordinance passed by the city council); *Paz v. Weir,* 137 F. Supp. 2d 782, 797-98

(S.D. Tex. 2001)  (discussing the different types of policies and how to prove liability for each).

  Therefore, Plaintiffs' MSJ establishes that there is no genuine issue of material fact

regarding the City's discriminatory and arbitrary enforcement[2] of the Ordinance.  The Response

does not show otherwise but rather confirms the propriety of summary judgment.  Notably, the

---

[1] All citations to motions refer to the page number at the bottom of the page and not the ECF heading page numbers.

[2] While the City's efforts to end homelessness through its work with the Bridge and the Crisis Intervention Division (Response at 12-13) are laudable, they have absolutely nothing do with the City's arbitrary and discriminatory enforcement of the Ordinance and harassment of food providers like Plaintiffs and others.  Nor does the City claim its outreach efforts have any connection with the food providers' activities.  Thus, the City's outreach efforts are irrelevant and do not create a fact issue regarding the City's inconsistent enforcement of the Ordinance.

Response does not allege that the enforcement did not occur.  Response at 19-20.  Nor does the Response suggest that the City has uniformly enforced the Ordinance.  *Id.*  Thus, the City's inconsistent enforcement of the Ordinance provides an independent basis for granting summary judgment that the Ordinance is vague.

## III.   APPLICATION OF THE HOMELESS FEEDER SECTION TO INDIVIDUALS

Likewise, the City's enforcement of the Homeless Feeder Section against individuals provides yet another reason justifying summary judgment for vagueness.  The Response side-steps the Ordinance's vagueness problem with respect to ticketing individuals under the Homeless Feeder Section, focusing instead on whether an individual could avail himself of the Section.  This is irrelevant.  The problem, as explained in Plaintiffs' MSJ, lies in the City enforcing the Homeless Feeder Section against individuals who have no notice the Section applies to them because the Section explicitly states it only applies to organizations.   Plaintiffs' MSJ (DE 80-1) at 23-24.

The City has not disputed that it has repeatedly issued warnings and citations to persons in their individual capacity, rather than to organizations as required by the Ordinance.  Plaintiffs' MSJ (DE 80-1) at 23-24; McIntyre Decl. at ¶6 and attached tickets, App. 424 & 426-435.  Moreover, the Response offers no justification for ticketing unsuspecting individuals, presumably because the City's own testimony confirms that this Section fails to provide the constitutionally required notice.  In fact, the City concedes the Homeless Feeder Section does not apply to individuals and it was not designed to allow individuals the opportunity to provide meals.  Rayzer Dep. 53:11-16; 145:8-12, DAPP. 195 & 218, respectively.  Thus, well-meaning individuals have no notice that the City requires them to comply with this Section.

3

Compounding the problem, the City lacks explicit standards for when an individual must comply with the Homeless Feeder Section.  Rayzer Dep. 231:22-232:17, DAPP. 240.  Rather, the City has explained that whether the Homeless Feeder Section applies to an individual sharing food with multiple homeless people "is going to depend on how large [the group receiving food] becomes."  *Id*.  But when asked what size the group would need to become, the City had "no set number."  *Id*.  Rather the individual must comply with the Section when the size of the group "would cause a disruption."  *Id*.

This inherently standardless criterion is the epitome of vagueness:  what qualifies as a large group to one officer is not large to another; what causes disruption to one person may not cause disruption to another.  *See e.g. Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding that a statute using the term "annoy" was vague because "[c]onduct that annoys some people does not annoy other");  *McCray v. City of Citrus Heights*, No. S-99-1984 WBS DAD, 2000 U.S. Dist. Lexis 13593, at *15-18 (E.D. Cal. Aug. 7, 2000), App. 537-538 (finding the ordinance unconstitutionally vague because the term "amplified" provides no objective standard indicating how large or great the amplitude must increase before the ordinance applied).  As such, numerous courts have invalidated as vague other statutes relying on this type of arbitrary and subjective criteria.  *Coates*, 402 U.S. at 614; *Gray v. Kohl*, 568 F. Supp. 2d 1378, 1386-87 (S.D. Fla. 2008)  (striking as vague a statute that turned on whether the accused was engaged in "legitimate business"); *Timmons v. City of Montgomery*, 658 F. Supp. 1086, 1089-90 (M.D. Ala. 1987) (declaring a loitering statute unconstitutionally vague because the phrase loitering "without apparent reason" was too subjective).  Similarly, this Court should also strike the Ordinance as vague in light of the City's subjective interpretation and the Ordinance's failure to provide any notice that the Homeless Feeder Section applies to individuals.

## IV.   LIKE THE ORDINANCE, THE CITY'S RESPONSE FAILS TO CLARIFY THE MEANING OF "PREPACKAGED"

Summary judgment on vagueness grounds is also appropriate because the definition of "prepackaged" is as clear as mud.  The Response further muddles its meaning by attempting to rely on the Texas Food Establishment Rules ("TFER").   TFER defines "packaged" in relationship to actions taken by a food establishment.  25 T.A.C. § 229.162 (63), App. 147-148; Response at 6-7, 26-27.   But, the Ordinance and TFER have different definitions of food establishment.   Dallas City Code § 17-1.5(a), App. 4 (stating that the Ordinance did not adopt TFER's definition of food establishment); *compare Id.* § 17-1.5(b)(6) *with* 25 T.A.C. § 229.162 (40), App. 5-6 & 147-148, respectively; McAndrew Depo. Tr. at 40:16-44:7, DAPP. 339-340. As a result, reliance on TFER's definition of "packaged" does not save the Ordinance from vagueness.  Instead, resorting to the TFER raises more questions than answers, namely:

- Which definition of "food establishment" should be used if one relies on the TFER's definition of packaged?

- Does "prepackaged" mean food wrapped by a "food establishment" as defined by the Ordinance or a "food establishment" as defined by TFER?

Given that the definitions of "food establishment" under the Ordinance and TFER are not the same, persons of common intelligence will necessarily arrive at different meanings of "prepackaged" depending on which definition of "food establishment" they use.   The City's Response illustrates the confusion caused by the conflicting definitions.  The Response touts the City's expert's definition of "prepackaged," claiming that it means food "packaged with an intact package at . . . a food establishment."   Response at 7, 27.   But, the City's expert relied on TFER's definition of "food establishment" not the definition provided in the Ordinance. McAndrew Dep. 44:2-7, DAPP. 340 (admitting that he relied on TFER's definition of food establishment for his report and his deposition testimony).   If accepted, the City's definition

5

would require citizens to rely on the Ordinance's definition of "food establishment" in determining whether the Ordinance applies but then they must use TFER's different definition of "food establishment" to determine whether they were serving "prepackaged" foods.  Such flip-flopping would undoubtedly confuse persons of common intelligence.

More important, citizens cannot reconcile the conflicting definitions when trying to interpret the type of establishments the Ordinance excludes.  The Ordinance excludes from the definition of food establishment "an establishment that offers only prepackaged foods that are not potentially hazardous."  Dallas City Code § 17-1.5(b)(6)(C), App. 5; Response at 6, 26.  The City's position requires the establishment offering "prepackaged" food to consider itself a food establishment under TFER to determine whether the food it serves is prepackaged and then exclude itself as a food establishment under the Ordinance because it serves prepackaged food. This confusing and circular analysis prevents persons of reasonable intelligence from discerning the meaning of "prepackaged" and whether the Ordinance applies to them.

Putting aside the differing definitions of "food establishments" in the Ordinance and TFER, the City's Response still fails to distinguish between prepackaged and packaged.  The City claims "prepackaged means 'packaged with an intact package at either a food establishment or manufacturing plant.'"  Response at 7, 27; Rayzer Dep. 159:10-22, DAPP. 221.  But that is exactly how TFER defines "packaged."  Under TFER "packaged" means "bottled, canned, . . . whether packaged in a food establishment or food processing plant."  25 Tex. Admin. Code § 229.162(63), App. 150.  By requiring packaging to occur at the food establishment or processing plant, TFER's definition of "packaged" necessarily means that the food is packaged before it is served.  Consequently, the City's attempt to define "prepackaged" to mean "packaged before it was served" (Response at 27) fails to differentiate between packaged and prepackaged.  The two

words cannot mean the same thing. Therefore, the Ordinance forces people of common intelligence to necessarily guess at the meaning of "prepackaged." Consequently, the Ordinance is impermissibly vague.

## V. THE CITY'S INABILITY TO DEFINE THE ELEMENTS OF THE PRIVATE EVENT DEFENSE CONFIRMS NO REASONABLY INTELLIGENT PERSON COULD UNDERSTAND THE ACTIVITIES TO WHICH THE DEFENSE APPLIES

The Response also substantiates Plaintiffs' contention that the Private Event defense is vague, thereby warranting summary judgment.

### A. The contrived "private property" limitation renders the Private Event defense vague.

In its Response, the City admits it reads a "private property" requirement into the Private Event defense. Response at 9. Accordingly, the City does not interpret the Ordinance to apply when a church shares food *on its own property* and otherwise meets the requirements of the Private Event defense. *Id.* (emphasis added). But, as the City acknowledges, the Private Event defense contains no location restriction, private property or otherwise. Dallas City Code § 17-1.6(a)(3), App. 7; Rayzer Dep. 58:5-25; 84:22-24, 117:3-6, DAPP. 196, 202, & 211, respectively. The City's addition of this non-existent limitation to the Private Event defense proves that the defense fails to provide the requisite notice.

### B. The remaining Private Event defense elements are ambiguous.

The City's interpretation of the stated elements of the Private Event defense are equally unclear. The Private Event defense applies to events for which there is no public advertising, no public solicitation of funds, no participation by the general public, and the gathering is only open to invited guests. Dallas City Code § 17-1.6(a)(3), App. 7. The City's interpretation of these elements is ambiguous at best, and at times outright contradictory.

### 1.      Public Advertising

Consider the public advertising prong.  The City concedes that billboards and newspaper ads constitute public advertisements.  Rayzer Dep. 68:18-21; 106:11-25; DAPP. 198 & 208, respectively.  But as interpreted by the City, a church advertising its event on a billboard would not necessarily preclude the church from relying on the Private Event defense, even though the Private Event defense plainly states it does not apply when events are publicly advertised.  *Id*. at 106:11-25, DAPP. 208.  Similarly, according to the City, the following ads do not qualify as public advertisements under the Private Event defense because the churches[3] published the ads in the Street Zine newspaper.  Ex. 96 to Rayzer Dep., App. 556; Rayzer Dep. 74:13-75:22, DAPP. 200.



Conversely, if these same ads appeared in the Dallas Morning News, the City would then construe the ads as public advertisements.  *Id*.  The City claims the respective newspapers' different distribution rates partially justify this inconsistent interpretation.  Rayzer Dep. 74:13-

---

[3] Cornerstone Baptist Church has never been an approved meal provider site.  *See* Meal Provider Site Lists, DAPP. 324-329.  Moreover, although Dallas International Street Church was originally an approved meal provider site, from approximately July 2008-June 2010, it was not an approved site.  *Id*. DAPP. 327-329; Rayzer Dep. 133:8-134:2, DAPP. 215.  Advertisements similar to those depicted above appeared in the Street Zine during the time period that Dallas International Street Church was not an approved site.  *See, e.g.,* Dec. 2009 edition of Street Zine, App. 571; Nov. 2009 edition of Street Zine, APP. 591.

75:22, DAPP. 200.  But, the Private Event defense contains no such distinction.  Thus, the City's interpretation directly contravenes the plain language of the Private Event defense, which necessarily eliminates the defense where any public advertising occurs.  Because the City lacks a uniform interpretation of public advertisement, persons of ordinary intelligence must speculate as to when the Private Event defense applies to events that they publicly advertise.

### 2.      Invited Guests

Similarly, the City's interpretation of invited guests and general public fails to apprise reasonable citizens of the phrases' meaning.  According to the City, an invited guest must have some association or relationship with the host, otherwise the invitee is a member of the general public.  Response at 11; Rayzer Dep. 112:2-19, DAPP. 209.  However, nothing in the Private Event defense limits to whom an invitation can be extended.  Dallas City Code § 17-1.6(a)(3), App. 7.  Nor is there any requirement to have some type of association with the invitee before the event.  *Id*.  Thus, the City's contention (Response at 10-11) that Edwards' invitation to 12-15 homeless people on the street does not fall under the Private Event defense only confirms that the City interprets the defense in a way that provides no reasonable notice.  Because the defense contains no hint that the invitations must be extended to persons with whom the host has a relationship, citizens have no idea what conduct the Ordinance covers.

The vagueness of the Ordinance, as interpreted by the City, is particularly apparent when compared with the realities of private events.  First, the City's interpretation, which requires some relationship or association, falls apart when applied to the traditional church service.  The City admits that most churches are open to the general public.  Rayzer Dep. 88:19-89:7, DAPP. 203-204 (admitting that most churches welcome anyone regardless of their faith).  As such, there is no relationship between the invitee and the church.  But the City classifies as invited guests

9

people who attend a church service in response to an impersonal newspaper ad.  Rayzer Dep. 72:11-16, DAPP. 199.  How then can the City justify denying the Private Event defense to Edwards when he personally invited certain homeless people to a tailgating event?  If a person responding to a newspaper ad qualifies as an invited guest, surely specific homeless people to whom a verbal invitation was extended qualify as invited guests.  The fact that the City contends otherwise establishes that the Ordinance fails to provide reasonable notice of the meaning of "invited guest" and "general public."

Second, even if this illusory relationship requirement existed, the City has no standard by which to judge what constitutes a relationship.  Indeed, the City has explained that even sharing food with the same group of homeless individuals over a period of six months would still not make those individuals invited guests.  Rayzer Dep. 116:14-22, DAPP. 210.  According to the City:  "It doesn't become a private event simply because I have that event there on a regular basis and get to know the people."  *Id.*  If six months of regular contact with the same group of homeless people does not establish the requisite relationship, what does?  No one knows.  Once again, the City's interpretation of the Ordinance forces reasonable minds to speculate about the applicability of the Private Event defense.

## VI.  THE MEANING AND APPLICATION OF THE ORDINANCE AS A WHOLE REMAINS UNCLEAR

### A.  Even the City's employees do not know what the Ordinance means.

The Response also illustrates the vagueness plaguing the Ordinance because neither the City nor its employees can comprehend it.  For example, the City claims its staff is available to "interpret and provide guidance about the meaning of the Ordinance, thus clarifying allegedly vague components."  Response at 24.  But the Response disavows the City employees' guidance by claiming that they misapplied the Ordinance, mistakenly asserted the criteria for the Homeless

10

Feeder Section, and mistakenly issued a warning to Plaintiffs. Response at 19-20. Apparently, the City employees cannot accurately interpret and provide guidance about the Ordinance's meaning, which proves Plaintiffs' point — persons of reasonable intelligence cannot decipher the Ordinance.[4]

Furthermore, City employees offer no additional clarification at the safe handling food course. Conspicuously absent from the City's assertion to the contrary is any evidence or affidavit suggesting that City employees address the meaning of "prepackaged" or "operation" during the course. Response at 24. That is because the course training materials do not address these issues. *See* Food Safety Course Materials, App. 595-602. Unable to obtain credible guidance from City employees or the food safety course, reasonable minds must guess at the Ordinance's meaning, thereby confirming that it is impermissibly vague.

**B.     The City also has not and cannot explain why Plaintiffs must comply with the Ordinance.**

Also telling is the City's inability to explain why Plaintiffs must adhere to the Ordinance. As an initial matter, the City's assertion that vagueness challenges cannot be based upon statutory exemptions (Response at 20) is factually and legally wrong. The whole point of a vagueness challenge is that the Ordinance fails to provide notice of what conduct is allowed and prohibited under the law. *Chicago v. Morales,* 527 U.S. 41, 60 (1999). Thus, one is entitled to know if one's conduct is exempt from a law. Consequently, courts have determined that exemptions to statutes are unconstitutionally vague where they lack clarity as to when or how an

---

[4] As stated in Plaintiffs' Opposition brief (DE 89 at 19), City employees have also provided conflicting guidance about prepackaged foods. The City's Motion to Dismiss argued that Plaintiffs could share prepackaged food without any location restriction, whereas City employees have advised others that they would violate the Ordinance if they shared prepackaged food with homeless people at unapproved locations. *See* DE 89 at 19. Thus, the City's conflicting interpretation of the prepackaged food exemption further confirms that the City's attorneys, 30(B)(6) designee, and senior officials cannot discern the Ordinance's meaning.

establishment qualifies for the statutory exemption.  *See Camp Legal Def. Fund, Inc. v. City of Atlanta,* 451 F.3d 1257, 1279-80 (11th Cir. 2006) (upholding a facial challenge to an ordinance's exemption for city-sponsored events because it granted officials unbridled discretion); *Bankshot Billiards, Inc. v. City of Ocala,* 692 F. Supp. 2d 1343, 1350-53 (M.D. Fla. 2010)  (holding that subsections defining the exemption to the law's prohibition were unconstitutionally vague and indefinite).

Moreover, contrary to the City's assertion (Response at 20), Plaintiffs have not implicitly conceded they engage in conduct the Ordinance restricts.  Plaintiffs have repeatedly asserted that they do not know whether the Ordinance applies to their conduct because of the Ordinance's vague definitions or lack thereof.  *See* Opposition Brief, DE 89 at 2; Complaint (DE 52) at ¶¶24-26, 43, App. 84-85 & 92, respectively.  Likewise, as discussed above, Plaintiffs contend the Ordinance provides no notice that individuals must comply with the Homeless Feeder Section. Conversely, the City has unjustifiably pigeon-holed Plaintiffs' activities[5] under the Ordinance.

Despite its admission that Plaintiffs are not food establishments, for some unexplained reason the City contends that Plaintiffs must adhere to the food establishment Ordinance.  *See* Opposition Brief, DE 89 at 2.  That is the equivalent of telling an airplane pilot he must adhere to the speed limit signs on Interstate 45.  Airplane pilots need not follow the driving laws for the obvious reason that they don't drive cars; they fly airplanes.  Just as the posted speed limit signs

---

[5] The Response appears to misunderstand the nature of Plaintiffs' religious beliefs.  (Response at 15-16, 22-23).  As detailed in Plaintiffs' MSJ (DE 80-1 at 5-6) and Opposition Brief (DE 89 at 12-13), Plaintiffs assert that their religious beliefs compel them to share food, the same way other persons' religious beliefs compel them to partake in communion/Eucharist.  Although Big Hart Ministries has an additional religious belief in sharing religious messages while sharing food, that additional belief is not asserted here for summary judgment purposes.  Big Hart's beliefs regarding sharing religious messages are distinct and separate from its food sharing activities, just as the act of taking communion/Eucharist, is separate from the sermon/message delivered during that service.  Moreover, each belief (sharing food, and sharing food while preaching) provides an independent basis for establishing a free exercise of religion.  To simplify the summary judgment briefing, Big Hart only asserts one of its belief since only one belief is necessary to show Big Hart's activities qualify as religious exercises.

would never signal to a pilot that he should abide by the speed limit signs, the Ordinance does not provide any notice that non-food establishments must comply with it.  That the City believes non-food establishments, such as Plaintiffs, must adhere to the food establishment Ordinance leads to the inescapable conclusion that the Ordinance is vague.

## C.      The meaning of "operation" remains unclear.

In addition to this fundamental disconnect, the City's Response also fails to provide the necessary clarity regarding the meaning of "food establishment" and "operation."  For instance, the Response asserts that "food establishment" does not encompass one individual sharing food with another person because that individual "is not engaged in an operation such as those listed in the Ordinance."  Response at 26.  Again forgetting rudimentary English lessons, the Response attempts to clarify the meaning of "operation" by referring to an operation (i.e. stating that the person is not engaged in an operation).  Such circular reasoning only further obscures the meaning of "operation."

Moreover, this argument is misleading.  Recall that the Ordinance essentially defines a food establishment as an operation that serves food for human consumption and relinquishes food to the consumer directly.  Dallas City Code § 17-1.5(b)(6)(A), App. 5-6.  According to the City, a person engaged in one on one food sharing does not qualify as a food establishment because person A giving a sandwich to person B is not "serving food" as required by the Ordinance, rather it's simply sharing a sandwich.  Rayzer Dep. 45:16-46:10, DAPP. 193.  Thus, the reason the person is not a "food establishment" has nothing to do with the meaning of operation.  Instead, as interpreted by the City, one on one food sharing turns on the quantity of food person A serves to a specific quantity of people.  *Id.*  But the City has no idea what quantity would be required to determine whether the individual is serving food or not because the

13

Ordinance does not define the quantity of food or people. *Id.* Notwithstanding the City's semantics in purporting to differentiate between sharing and serving, the lack of firm criteria renders it impossible for citizens to know whether the Ordinance prohibits their conduct, and thus, the Ordinance is impermissibly vague.

In addition, the "such as" section of the Ordinance's definition for "food establishments" uncovers even more ambiguities. The City's Response appears to assert that the examples listed in the "such as" section of the definition of "food establishments" clarify any potential confusion. Response at 5 & 25. However, the City is mistaken. Instead, its argument further proves that men of common intelligence must necessarily guess at the meaning of "operation" and thus by extension "food establishments." The examples section on which the City relies defines "food establishments" in part, as an "operation:"

> such as: a food service establishment; retail food store; satellite or catered feeding location; catering operation; if the operation provides food directly to a consumer or to a conveyance used to transport people; market; remote catered operations; conveyance used to transport people; institution; or food bank.

Dallas City Code § 17-1.5(b)(6)(A), App. 5-6.

This list exacerbates the confusion created by the ambiguous definition for several reasons. First, as the City admits, the list is not all inclusive. Rayzer Dep. 44:9-25, DAPP. 192. As such, citizens are left to speculate as to what other "operations" would fall under the Ordinance.

Second, the grammatical structure of the definition makes no sense whatsoever. The examples following "such as" are all separated by a semicolon – meaning that each stands independently of the others. Therefore, applying basic principles of the English language, one

14

example of an operation would be an "operation[6] provid[ing] food directly to a consumer."  This example, however, makes prong (ii) of the definition ("relinquishes possession of food to a consumer directly") redundant, thereby further confusing and frustrating the citizen's unsuccessful attempt to decipher the meaning of "operation."  *See* Dallas City Code § 17-1.5(b)(6)(A)(ii), App. 6.

Third, the City failed to point out other examples listed in the "such as" section that could encompass a variety of activities, including Plaintiffs.  The "such as" list includes the example of a "conveyance used to transport people."  Dallas City Code § 17-1.5(b)(6)(A), App. 5-6.  This would seem to encompass instances of sharing food out of vehicles.  Thus, are the fans tailgating out of the back of their pickup trucks "operations" and therefore, "food establishments?" Similarly, when Edwards and others share food with homeless people from their SUVs (*see* Edwards Dep. 26:5-23, DAPP. 158), are they considered an "operation?"  The answer is unclear.

The exemplar list also includes "an institution."  Dallas City Code § 17-1.5(b)(6)(A), App. 5-6.  The word "institution" evokes numerous things, none of which would seemingly be food establishments.  For example, banks are financial institutions and they often provide complimentary coffee or cookies to customers.  Are they now "food establishments" subject to the Ordinance?  Accordingly, despite the City's assertions to the contrary, the "such as" list does provide any clarity; rather, it only adds further confusion, thereby confirming that the definition of "food establishment" is impermissibly vague because it turns on the ambiguous term "operation."

---

[6] Again, the Ordinance circularly defines "operation" using "operation," further sowing confusion.

## VII.   CONCLUSION

Therefore, for the reasons stated above, Plaintiffs are entitled to summary judgment that the Ordinance is impermissibly vague.

Respectfully submitted,

Dated:  November 19, 2010

HOWREY, LLP

By:   s/ Deidra Penny_____
Deidra Penny
Lead Attorney
State Bar No. 24036668
pennyd@howrey.com
1111 Louisiana, 25th Floor
Houston, Texas 77002
713-654-7668 (phone)
713-787-1440 (fax)

Attorneys for Big Hart Ministries
Association Inc. a/k/a Big Heart Ministries,
the Rip Parker Memorial Homeless
Ministry, and William Edwards

**CO-COUNSEL:**
Tulin Ozdeger
National Law Center on Homelessness & Poverty
1411 K Street NW, Suite 1400
Washington, DC 20005
202-638-2535
tozdeger@nlchp.org

16

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule 5.1(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.


s/ Deidra Penny
Deidra Penny, Attorney for Plaintiffs